**UNITED STATES v. LEYDE & LEYDE et al.**

No. 4002.

United States District Court
D. Maryland, Civ. Division.

March 16, 1950.

Bernard J. Flynn, U. S. Atty., Baltimore, Md., C. Ross McKenrick, Asst. U. S. Atty., Baltimore, Md., Wm. M. Lytle, and Frederick L. Smith, Attys., Dept. of Justice, Washington, D.C., for plaintiff.

Irvin Goldstein, Washington, D. C., Rubin Gertz, Baltimore, Md., for defendants.

CHESNUT, District Judge.

The United States has brought suit under section 19 of the Contract Settlement Act

of 1944, 58 Stat. pp. 649–671, 41 U.S.C.A. §§ 101–126, against the defendants. The purpose of the suit is to recover damages and penalties for alleged fraudulent claims submitted to the Maritime Commission, an agency of the United States, with respect to amounts claimed to be payable to the defendants and to an alleged subcontractor by reason of the cancellation of certain contracts for the manufacture and equipment of life rafts.

■ The main objectives of the Act as stated in section 1 are, in order to secure maximum war production, to assure contractors and subcontractors of equitable final settlement of claims under terminated war contracts, and adequate interim financing until such final settlement, and compatible with these objectives "to detect and prosecute fraud". The 25 sections of the Act contain elaborate and detailed provisions with respect to the administrative procedure to be followed within the agency regarding the ascertainment of the amounts properly due to the contractors and subcontractors, including, if desired, an appeal by the claimant from the original determination to an Appeal Board or, under certain conditions, to the Court of Claims, or the United States District Court under the Tucker Act, 28 U.S.C.A. §§ 1346, 1402, 1491. A reading of the Act readily gives the impression that it was the purpose of Congress to fully and fairly compensate war contractors whose contracts had been terminated, as a result of the termination of active hostilities, for all costs and expenses reasonably incurred by them in the prosecution of their contracts including a fair profit, all in accordance with established sound accounting practices. Allis-Chalmers v. United States, 7 Cir., 165 F.2d 495. In view of the liberal provisions of the Act and in order to prevent the payment of fraudulent claims on the Treasury of the United States, section 19, 58 Stat. 667, 41 U.S.C.A. § 119, provided both civil penalties and criminal sanctions for making fraudulent claims by war contractors subject to the Act. Thus section 19(d), later repealed as unnecessary, made applicable, as a criminal sanction, the well-known provisions of section 35A of the Criminal Code, § 80, prior to the recent Revision, now sections 287, 1001, which in broad and sweeping language authorizes substantial punishment for known and intentional fraud in claims on the public treasury. And section 19(c) (1) of the original Act, 58 Stat. 667, 668, 41 U.S.C.A. § 119(1–3), in almost identical language imposes civil liability for such frauds which include (1) "an amount equal to 25 per centum of any amount thereby sought to be wrongfully secured or obtained but not actually received," and (2) the refunding of any payment received as a result of the fraud, and (3) the payment to the United States of $2,000 for each such fraudulent act, and (4) double the amount of any damage which the United States may have sustained by reason thereof, together with the costs of suit.

Section 19(c) (2) confers upon the District Courts of the United States of the District where the defendant "resides" or shall be found, jurisdiction to hear, try and determine such suit.

The complaint in this case, filed May 6, 1948, alleges that the defendants in April and May, 1945 made five separate contracts with the United States Maritime Commission, an agency of the United States, for the construction and production of (as amended) 566 life rafts with certain specified equipment. Deliveries thereunder were to be made from time to time up to and including December 1945. The total contract price for the whole number was $714,625. The contracts provided for the right of cancellation by the United States in whole or in part, and that in such event settlement of any claims of the defendants or their subcontractors would be made in accordance with the terms of the contracts and the provisions of the Contract Settlement Act, and the applicable regulations thereunder.

Four of the contracts were cancelled or terminated on August 20–22, 1945, and the fifth on September 5, 1945. Thereafter in October of that year the defendants filed three claims or statements, two by and in the name of the prime contractor, Leyde & Leyde, the defendants in this case, and the

third filed by the defendants in the name of an alleged subcontractor, the Potomac Enterprises. It was further particularly alleged in the complaint that the defendants in violation of section 19 of the Act submitted known and intentionally false, fraudulent and fictitious claims amounting in all to the sum of $58,245.05, of which total amount the claim filed by the defendants on behalf of the Potomac Enterprises, an alleged subcontractor, included fraudulent claims in the amount of (1) $8,235.30 for direct labor; (2) $4,264.50 for indirect factory expense; (3) $980.39 for general and administrative expense and (4) $1,675.45 for profit on said alleged costs. As to one of the claims filed in the name of Leyde & Leyde as the prime contractors, it was alleged that $38,409.16 claimed for experimental research, engineering development expenses, and $1,230.32 for general and administrative expenses, and $2,876.24 profit, was false and fraudulent; and in the other claim by Leyde & Leyde it was alleged that false and fraudulent claims were $551.56 for general and administrative expenses and $22.13 for profit on said expenses. The complaint ended by demanding payment to the government of the amounts of penalties and damages authorized by section 19(c) (1) of the Act.

After the defendants had been duly summoned on May 11, 1948, they failed to file an answer within the time required and on September 16, on motion of the plaintiffs, judgment by default was entered. On October 11, on the defendants' motion, the judgment by default was stricken out and leave given them to answer. On the same day the answer asking for a jury trial (later waived and the case tried as a non-jury case) was filed by the defendants. Thereafter the original counsel for the defendants retired from the case and the present trial counsel entered their appearance, and on January 16, 1950, moved for leave to amend the answer by adding an additional paragraph reading: "That the defendant, Glenn W. Leyde was indicted on January 28, 1947, tried on said indictment and on January 30, 1947 acquitted on all counts thereof. That the amounts and things referred to in the complaint herein were included in the said indictment and that the prosecution of the said action was therein barred as res adjudicata and/or double jeopardy". On that motion the court issued a show cause order why the amendment should not be allowed. Counsel for the plaintiff opposed the allowance of the amendment on the ground that it constituted no defense to this suit. Counsel were heard on that point at an extended pre-trial conference in the case on January 23, 1950 and decision was reserved until the trial of the case then set for February 6, 1950.

The development of the evidence in the case on the many trial days has presented difficulties. The numerous separate contracts, subcontracts, cancellations, correspondence, interim and final claims (with a multitude of monetary figures) and related papers constitute about eighty separate exhibits; and there was extensive oral evidence applicable in general or particular to the multiplicity of figures in the case. After the case had been on trial for four full days the illness of the active trial counsel for the defendant necessitated a week's postponement. More than four years have elapsed since the claims were first filed and in the meantime there have been numerous administrative hearings in the Maritime Commission, and an extended criminal trial of the case against Glenn W. Leyde in the District of Columbia. As a not unnatural consequence, different persons have had possession of many of the original documents relevant to the case from time to time with some resulting uncertainty and confusion with respect to particular papers, all of which has entailed some confusion. However, despite the voluminous data in evidence and the perhaps unavoidable tendency to confusion, certain facts stand out as substantially uncontradicted. I will begin with a statement of them.

The defendants, Leyde & Leyde, constituted a partnership consisting of Glenn W. Leyde and his wife, Ardis M. Leyde. She died in 1948 after this suit was instituted, and her personal representative, if any, has not been made a party. Glenn W. Leyde, now about 50 years of age, gradu-

ated from the United States Naval Academy and shortly after retiring from the Service was engaged for several years in a rather minor clerical capacity at a very moderate salary in various Government departments in or near Washington. In 1941, however, he retired from the Government Service and became a broker or agent for various manufacturing concerns in actual or prospective war equipment. He found this employment very profitable during the war years 1941 to 1945, realizing net compensation of about $40,000 a year. He is a marine engineer and interested himself in designing life saving or marine equipment. After several unsuccessful attempts he succeeded in designing and making a raft for carriage on ships for which he obtained the approval of the Coast Guard and the design formed a part of the specifications for the 566 rafts embraced in the five contracts which he made with the Government. The design for the rafts included structures having a superficial area of 8 x 14 feet with thickness of about 4 feet and consisting in principal part of oak timbers forming the upper and lower faces of the raft between which were inserted a very light and buoyant substance called Styrofoam.

The partnership between Mr. and Mrs. Leyde was formed about 1941 but was not evidenced by any written articles. It did not have any established capital or place of business or other equipment for the manufacture of rafts. Leyde made subcontracts for all of the 566 rafts for which he had prime contracts with the Maritime Commission.

Under date of June 6, 1945 Leyde gave an order to "Potomac Enterprises" for the purchase of 100 rafts at $700 each and this was accepted in writing by Potomac Enterprises. Leyde stated that the 100 rafts so subcontracted to Potomac Enterprises were that number comprehended in his contract with the Government designated as MCc 38107, time of delivery to be 5 in September, 40 in October, 40 in November and 15 in December. Place of delivery to be Baltimore, Maryland. When this contract was cancelled by the Government on August 22, 1945, Potomac Enterprises had not made or started to make any of the 100 rafts; but the claim filed by Leyde in the name of Potomac Enterprises contained items which included the amounts of $8,235.30 for "direct labor", $4,264 for "indirect factory expense", $980.39 for general and administrative expenses and $1,675.45 for profit on said alleged costs. It is the Government's contention that the use of Potomac Enterprises as a subcontractor for the manufacture of 100 rafts was a fraudulent and fictional scheme, devised by Leyde soon after V-E Day in May 1945 in anticipation of the possible or probable cancellation of the unfinished portion of his contracts, to increase the amount of the claim which Leyde would make under the Contract Settlement Act.

While the evidence with respect to the bona fides of the subcontract with Potomac Enterprises is much in dispute, certain facts with regard to it are fairly well established by the weight of the evidence. In the first place the Potomac Enterprises was never incorporated until some time in 1946, months after the claim was filed in its name as a subcontractor. The earliest date at which we hear of Potomac Enterprises is about May 1945. At that time it is said to have been a partnership in which Glenn Leyde had a 40% interest, his wife a 20% interest, his long time friend, a Mr. Rosenberger, a 20% interest, and a man named Hickman the remaining 20% interest. Rosenberger conducted a decorating business at or near Falls Church, Virginia, where the Leydes lived in a residential neighborhood. The partnership was not evidenced by any writing, had no stated capital and never had a bank account in 1945. The oral evidence with regard to the purpose of its formation was to conduct activities of various kinds at a place at or near Morgantown, Charles County, Maryland, where is situated the Morgantown Bridge over the Potomac. For this purpose, in May 1945, the Leydes bought a large farm of about 250 acres about two miles from the Morgantown Bridge, for approximately $40,000. Of this acreage about 22 acres comprised a formerly used picnic ground bordering on the Potomac River. On it were one or two buildings

including a frame building about 30 by 50 feet, consisting of one large room and one small room, called, and apparently sometime previously used as a restaurant. Potomac Enterprises had printed some stationery on which it advertised that it was engaged in entertainment facilities including a hotel, bathing beach, fishing and camping parties and other somewhat similar activities. However, it never actually conducted such activities except that it did build and possibly rent from time to time certain duck blinds.

The design for the rafts included a closed receptacle or locker, to which access could be obtained from a doorway openable from either side of the raft, for the storage of equipment. In some of the subcontracts for the manufacture of rafts Leyde did not include the equipment which was required by his five contracts with the Maritime Commission. Some of the equipment for some of the rafts was ordered from Potomac Enterprises and the claim of Potomac Enterprises as a subcontractor includes substantial sums for the unused inventory of such equipment; but that feature of the claim is not here involved, or at least is not charged in the complaint to have been fraudulent. There was no lease or other written agreement between Leyde and Potomac Enterprises with respect to the occupation or use of a part of the farm.

The written claim of Potomac Enterprises as a subcontractor was signed by Rosenberger who died early in 1946. The claim was, however, filed by Glenn W. Leyde with his other claims and was represented by him to be a bona fide claim of a subcontractor. The contention of the Government is that the claims by Potomac Enterprises for direct labor and indirect factory expenses are wholly fictitious because Potomac Enterprises never even began the manufacture of a single raft and therefore could not possibly have had any proper claim either for direct labor or indirect factory expenses. Leyde seeks to support the bona fides of the claim on the ground that it was necessary for the Potomac Enterprises as a subcontractor for 100 rafts deliverable in September to December 1945 to promptly prepare a factory suitable for their manufacture. The so-called restaurant building was claimed by him to have been such a suitable building. The Government contends that even this is a purely fraudulent contention as it would have been practically impossible to have used the building for that purpose. There was evidence in this respect that the height of the ceiling was only about 10 feet while the superficial area of the rafts when finished was 8 x 14 feet; that there was no doorway or other opening from the room large enough to permit the exit of a raft 8 x 14 feet and that in general the remote location of the building made it entirely unsuitable as a factory or assembly place for rafts of this nature and size. In addition the Government contends that the several items constituting the total claim of $8,235.30 for direct labor were fictitious and unreal in that no such amounts had or could reasonably have been expended for such preparation of the building as was claimed by Leyde; and that in fact the evidence does not establish that such items were really paid by Leyde for or on account of the alteration of the premises.

Before making a finding with respect to the weight of the evidence as to the bona fides or fraudulent character of this claim of Potomac Enterprises, it will be well to state some other matters of fact which are established by the evidence. Before filing the claims Leyde received printed instructions or regulations which had been issued by the Maritime Commission with respect to the principles to be applied in the formulation and filing of the claim. Printed forms prepared by the Commission were also given to Leyde. In filling out the forms first filed they were checked as "interim" as distinct from "final" claims in the box provided therefor on the form; but an examination of the figures in the claim indicates quite clearly that they are in the nature of a final claim rather than a mere estimate or preliminary claim although Leyde contends that his understanding was to the contrary. The interim claims as actually entered on the forms were prepared by an accountant with whom Leyde conferred, a Mr. Hook, who,

however, accepted the figures given to him by Leyde without independent advice or knowledge and arranged them in appropriate accounting form on the printed forms. Leyde also conferred with the accountant with respect to the general nature and allowability of some of the items of the claims, particularly the larger item of some $38,000 in one of the claims for costs of engineering and research. The accountant stated that he thought there was a possibility that the nature of the claim might be allowable and that as it was only an interim and not a final claim and could not be supplemented by new and additional items, he thought it all right to file it. Leyde's claims were for amounts in excess of $100,000. He also about the same time filed "application for partial payment"; and in December received from the Commission $19,000 in prepayment on account. But it was not affirmatively shown in this case that this partial payment was an overpayment of the amount due from the Government, even excluding the whole amount of the items asserted to have been fraudulent.

In due course after the three claims were filed with the Commission the Chief of the Claim Division on examination thought the claims as stated largely questionable, and an audit was then ordered. After various conferences with Leyde the Chief of the Claims Division concluded the claims were probably fraudulent, as Leyde could not produce satisfactory vouchers or supporting data for many of the claims in dispute. After several unsuccessful efforts on Leyde's part to obtain more favorable consideration, he requested that the claim be transferred to another Board or Department of the Commission. After what was apparently adverse findings, the claims were considered by the Appeal Board who finally cancelled all findings because after conference with the Department of Justice it was decided that a criminal prosecution should be instituted. The result of it was an acquittal of Glenn Leyde; which was followed by the institution of the present civil suit.

Before coming to the precise question to be determined in this case on the weight of the evidence, to wit, whether the claims or any material part thereof were fraudulent in fact, it is desirable to pass on the question of law presented as to whether the acquittal in the criminal case is a bar to the prosecution of this civil suit.

■ After careful consideration of the petition to amend the answer, I have concluded that it should not be granted because under the circumstances heretofore stated the application is unreasonably belated; and more importantly, because the additional defense desired to be set up does not constitute a bar to a prosecution of this civil action either as a plea of res judicata or double jeopardy. After reviewing the recent authoritative appellate decisions on this point involving the application of the legal principles of res judicata and double jeopardy to other similar statutory provisions for both criminal and civil remedies in favor of the Government, I find that it has been definitely held that in the situation here dealt with the former acquittal of the defendant in the criminal case in the District of Columbia is not a bar to the prosecution of this civil suit. United States v. Grannis, 4 Cir., 172 F.2d 507, certiorari denied 337 U.S. 918, 69 S.Ct. 1160; United States ex rel. Marcus v. Hess, 317 U.S. 537, 548–552, 63 S.Ct. 379, 87 L.Ed. 443, and see Mr. Justice Frankfurter's concurring opinion, 317 U.S. at page 555, 63 S.Ct. 379. See also Helvering, Commissioner v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917.

■ With regard to the merits of the present case, I will deal first with the charge in the complaint that the claim submitted by Leyde for the Potomac Enterprises as a subcontractor for the manufacture of 100 rafts included items amounting to $15,155.64 which were false, fictitious and fraudulent within the meaning of the statute. With regard to the required burden of proof to sustain the charge in the complaint, it is my view that while the Government is not obliged to prove the charge beyond a reasonable doubt, nevertheless it is necessary that in establishing the charge of fraud the proof should be clear, unequivocal and convinc-

ing. Lalone v. United States, 164 U.S. 255, 17 S.Ct. 74, 41 L.Ed. 425; Maryland Casualty Co. v. Palmetto Coal Co., 4 Cir., 40 F.2d 374, 376; United States v. Mammoth Oil Co., 8 Cir., 14 F.2d 705, affirmed 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137; Conner v. Groh, 90 Md. 674, 686, 45 A. 1024; Cox v. Tayman, 182 Md. 74, 32 A.2d 368; 9 Wigmore on Evidence, 329, (3d Ed. 1940). And, to the extent that the evidence is merely circumstantial, it ought to exclude reasonable hypothesis of good faith. So treated, I have concluded on the evidence as a whole that the charge of the Government with respect to this item has been sustained, and that the claims in the amount stated must be regarded as false, fictitious and fraudulent. I have reached this conclusion of fact reluctantly in view of the defendant's acquittal in the criminal case and only after careful consideration of the very voluminous documentary and oral evidence in the case as a whole and the necessary inferences therefrom. It is quite impracticable in view of the volume of documentary and oral evidence to set out in detail all the evidentiary facts pro and con bearing on the problem; but I will refer to a number of the more dominant facts and circumstances which have impelled me to this conclusion.

Leyde asserts that the formation of the Potomac Enterprises as an independent partnership entity was conceived by him and the other partners for the first time in May 1945 and that the purpose was to be a general business for the manufacture of specialties of marine equipment or life saving devices as well as the conducting at or near Morgantown, Maryland, the operation of a hotel, picnic grounds, management of fishing parties and similar rural entertainment as already heretofore described. He further says that for the first business of the Potomac Enterprises it was intended that it should have the subcontract for 100 rafts.

In the first place, the defendant's evidence as to the separate entity of the Potomac Enterprises is not very convincing. It is said that the four partners were himself, his wife, his long-time intimate friend, Mr. Rosenberger, and a man named Hickman. Rosenberger died in 1946 and Mrs. Leyde died in 1948. Hickman is said to be living in a far western state and was not called as a witness nor was his deposition taken. In 1945 Potomac Enterprises had no capital, no property, no written articles of partnership, no bank account, no permanent or temporary staff of employees and no real factory, machinery or equipment of any kind for the manufacture of rafts. Whatever financial transactions it had in 1945 were handled in the Leyde bank account. A ledger or account book of many pages with many entries therein was produced by the defendant and stated to be the account book of Potomac Enterprises, but on examination the name Potomac Enterprises appeared nowhere in the whole book. But even if we accept Leyde's personal testimony that the Potomac Enterprises did have a bona fide individual existence in 1945, the inference of fact on the evidence as a whole is inescapable that Leyde himself was not only the dominant partner but substantially in entire control and management of the business activities of the Potomac Enterprises. As a subcontractor in this case it is difficult to see what could have been the motivation for its formation if not, as contended by the Government, that its main purpose was to increase the termination claim to be made by Leyde by a so-called mark-up of prices in consequence of the subcontract. It appears that in 1946 Leyde filed a partnership income tax return in the name of Potomac Enterprises but this was long after the contracts had been terminated and the interim claims referred to had been filed and were under audit. Potomac Enterprises was only incorporated some time in 1946.

The claim filed in the name of the Potomac Enterprises (Plaintiff's Ex. No. 10) dated October 29, 1945 was signed and certified by Claude B. Rosenberger, with accompanying certificate from Glenn W. Leyde as the prime contractor. It is entitled "Settlement Proposal (Total Cost Basis)", and was on a form prepared by the Maritime Commission. It referred to government prime contracts Nos. MCc 38106 and MCc 38107. No. 38106 related to

equipment for rafts, not here involved, and No. 38107 was for the manufacture of 100 rafts.

■ Eliminating the figures for the unused material on hand and to be delivered to the Government upon payment (with which we are not here concerned) the figures included in the claim (called in the paper a proposal settlement) were as follows:

| | | |
|---|---|---|
| Item 2 | Direct labor | $8,499.54 |
| Item 3 | Indirect factory expense (From Sched. A) | 4,947.70 |
| Item 6 | General administrative expenses | 6,376.35 |
| Item 8 | Profit—explained in schedule D | 9,918.05 |

The composition of the claim represented clearly enough that the Potomac Enterprises had expended $8,499.54 as costs for labor in the manufacture of life rafts and $4,947.70 for indirect factory expense in connection therewith. The evidence however clearly established that Potomac Enterprises had never made or even started to make a single raft, had no real factory or equipment for making rafts, and no force of employees therefor. The explanation offered by Leyde was to the effect that the expenditures were for repairs or preparation of his property at Morgantown, Maryland, looking toward the later manufacture of rafts. However, the evidence is convincing that the property referred to was in no way suitable or useable for that purpose and it is quite unrealistic to believe that Leyde could really have thought that it was. I find from the evidence that the sums represented as spent for direct labor and for indirect factory and administrative expense, and the percentage of profit attributable thereto were false and fictitious in that such items of cost as were in fact expended by Potomac Enterprises or by Leyde in the name of Potomac Enterprises, were for work done in the general improvement or development of the Leyde farm property at Morgantown and not for the purpose of manufacturing rafts.

I infer and conclude from the evidence as a whole that Leyde's representation of the status of the Potomac Enterprises as a bona fide contractor for the manufacture of 100 rafts, at the time the claim was filed, October 29, 1945, was merely a sham and pretense. It will be remembered that V-E day was about May 6, 1945. It is evident that Leyde then or shortly thereafter became what may be called with respect to these war contracts "termination conscious". About that time he called at the office of the Maritime Commission and made inquiry whether, if the contracts were terminated, he would be entitled to be paid for experimental research and development costs incurred prior to the making of his prime contracts with the Government. He was informed that such costs would apparently not be allowable.

An informal subcontract or order in writing was given by Leyde to Potomac Enterprises on June 6, 1945, for the manufacture of 100 rafts. Leyde's five separate prime contracts for rafts were identified respectively as MCc 38104; MCc 38105; MCc 38106; MCc 38107 and WSA 9909. Prime contract No. 38107 was for the manufacture of 100 life rafts. It was this prime contract which was the basis for the informal order or subcontract given to Potomac Enterprises on June 6, 1945. At that time Leyde had prime contracts for 139 more rafts than he had then previously subcontracted. But I find as a matter of fact in the case that on August 11, 1945 Leyde made a subcontract with one Gordon of Mateo, North Carolina, for the manufacture of the 100 rafts comprehended in his prime contract No. 38107. At that time Gordon already had obtained a subcontract from Leyde for 100 rafts under another prime contract and had manufactured and delivered some of them. And at that time Potomac Enterprises had never made a raft nor even started to make one. Leyde denied that this second subcontract with Gordon was for rafts covered by Leyde's prime contract 38107, but I am satisfied from Gordon's personal testimony given in court and supported by several documentary exhibits that the fact was as stated by Gordon. Leyde's explanation to the contrary is not convincing. If the subcontract given to Gordon on August

11th was not in substitution for those covered by the order of June 6th to Potomac Enterprises, then Leyde on August 11th had subcontracted for 61 more rafts than he had prime contracts for, even though well-known events at that time very clearly foreshadowed early cancellation of the contracts by the Government, which in fact did occur shortly thereafter. Leyde denied that by making the subcontract with Gordon on August 11th he had subcontracted for 61 rafts more than was represented by his prime contracts, saying that the 61 excess referred to were not in fact excess at all because he had subcontracted 152 rafts to the Barry Manufacturing Company and that, although they had delivered a number of them, they were in default with respect to the time of delivery of 112 and that it was his intention to substitute rafts made by Gordon for expected failures in delivery by Barry. But there was no evidence that Leyde had ever in writing at least notified Barry of its breach of contract for late deliveries, and Leyde's contention that he had was in effect denied by Edelman, a representative of Barry, as a witness in the case.

The claim of Potomac Enterprises included, as already stated, costs of $8,499.54 for direct labor on rafts. The items comprising this amount were not given in the claim but were furnished by Leyde to the Commission's auditor after the claim had been referred to him for investigation. Of the amount of $8,499.54 the Government contends that $8,235.30 is fictitious and fraudulent. The items comprising the latter amount are set out in a summarized schedule of all the Government's claims in this respect (resulting from its audit) and filed for convenience and understanding of the case as Plaintiff's Ex. No. 42. As previously stated the claim of Potomac Enterprises in this respect was a representation that the costs referred to had been incurred in the manufacture of rafts. I find that none of the items were for costs incurred in the manufacture of rafts. To the extent that they were actual cost to Leyde or Potomac Enterprises, I am satisfied that they were expenditures for general work on Leyde's farm. A substantial portion of the items were of very doubtful correctness as actual costs even for this purpose. Page 2 of Plaintiff's Ex. 42 includes an item as follows: "Claimed as paid Clarendon Decorating Co. (Mr. Rosenberger's company) for restoring and remodeling life raft assembly building $3450". Leyde presented to the auditor his (Leyde's) cancelled check for that amount payable to Clarendon Decorating Company, dated August 1, 1945. The auditor asked for a voucher in support and was given a bill dated January 1, 1946 for an amount of $2600. He rejected this as insufficient. Leyde obtained a revised bill from Clarendon Decorating Company for about $3450 dated September 1, 1945. The auditor or an agent of the FBI subsequently found the first bill among the papers of Clarendon Decorating Company with Leyde's handwriting thereon specifying changes as to date, amount and material. Another item in the cost accounts for direct labor was for $1625 paid Harold Wood for life raft construction. Wood was an employee for a time on Leyde's property near Morgantown and was paid $625. His services were apparently those largely of a supervisor or caretaker. Some part of the amounts was paid him for services subsequent to the cancellation of the contract. Leyde stated that he had made a mistaken estimate as to the total amount paid Wood. Another item on page 2 of the same compilation was for $800 paid Rosenberger "as due for services relative to life raft construction". Such a payment was not supported by reliable written evidence. Another similar item was for $800 paid Hickman, was likewise not established. Still other items were $150 paid one F. Johnson and $275 paid one Cantwell for services. From the evidence it appeared that the amounts of these latter payments were over-estimates by Leyde rather than actual amounts and the services were for attention to two pleasure motor boats which Leyde said were at times used in connection with his life raft design or construction business. Still another item was $207.45 paid to war prisoners for alleged work to promote life

raft construction; but I am satisfied from the evidence it was either for the general improvement of Leyde's property or, for purely farming work.

The Potomac Enterprises claim included an item of $4,947.70 for indirect factory expense. Of this amount the Government contends $4,264.50 was fictitious and I so find. As no rafts were ever made by Potomac Enterprises it is difficult to see how there could be any legitimate claim for factory expense. The amount of this item of the claim was itemized in schedule A filed with the claim. The amount contended to be fictitious is itemized on page 3 of Plaintiff's Exhibit 42. Without discussing every item involved it is sufficient to point out that among the items for which claim was made was $1,529.50 for the purchase of a farm tractor and plough and $1,650 for the purchase of a truck and $800 for the use of the Leyde property at Morgantown and $285 for gas and oil for the tractor and truck. It is sufficient to say that I find from the evidence that the tractor, plough and truck were only incidentally, if at all, used for the benefit of the Potomac Enterprises as a separate entity but substantially only for the benefit of the Leyde farm property. Leyde contends that the truck particularly was used for hauling life raft equipment.

I think it unnecessary to discuss in further detail the items of $980.39 for general and administrative expenses, and $1,675.45 for percentage of profits included in the complaint as fictitious and fraudulent. For the reasons previously indicated I find them to have been so in this case.

As heretofore stated, the claims filed by Leyde were marked interim rather than final claims. It is contended by Leyde that the claims as originally filed and marked interim claims were hurriedly prepared, and, to a large extent, necessarily based only on estimates, and that he expected later to file final claims which would be more carefully prepared and more exact in the items included. However, the evidence disclosed that, as will appear from the figures included in the several claims, the amounts were apparently based on very exact and detailed figures and were not merely proximate and estimated amounts. Further, when the claims were received the representative of the Commission having the matter in charge at once determined from a superficial examination of the claims that in his judgment the amounts were excessive and required careful audit. With reasonable promptness thereafter auditors visited Mr. Leyde and conferred with him about the claims. The auditors expressed to him doubt as to whether many of the items were allowable and an opportunity was given to him then to modify the claims, but I find from the weight of the evidence that he quite definitely insisted that the figures were substantially correct and declined to modify any of them at that time. Naturally the result was a more protracted audit and resultant numerous hearings in the offices of the Maritime Commission with the final result that the Commission would not approve the claims and the matter was referred to the Department of Justice. About a year later Leyde filed amended and final claims in which numerous changes were made in different items; many items previously urged were eliminated and others were supplied, not previously included. The total of the final claims varied only slightly from that of the interim claims. But the evidence satisfied me and I find that it was the intention and expectation of Leyde if possible to realize and collect as much as possible upon the claims as originally filed.

On November 13, 1945 Leyde & Leyde filed a claim entitled "Settlement Proposal (Total Cost Basis)" under their government prime contracts Nos. MCc 38104, 5, 6 and 7. The total amount claimed (exclusive of amounts stated to be settlements with subcontractors) was $107,197.05. Included in this amount (line 3) was "indirect factory expense (from Schedule A)". Schedule A was headed "Leyde & Leyde—indirect factory expense—and research and development expenses and costs". It itemized over thirty small miscellaneous items of expense amounting to about $2,000 and concluded in the last line of the itemization as follows: "Experimental research, engineering and develop-

ment expenses and costs (See 551.2 of Manual)—$38,409.16." There was no itemization of the latter amount. The reference to Manual 551.2 is to a regulation of the Maritime Commission (10 Fed.Reg. No. 92, p. 5224) dealing with the general subject matter of principles for determining costs. Only subsections D and E are here in point. They read as follows:

"D. *Experimental and Research Expenses.* General experimental and research expenses to the extent consistent with an established pre-war program, or to the extent related to war purposes.

"E. *Engineering and Development and Special Tooling.* Costs of engineering and development and special tooling; provided that the contractor protects any interests of the Government by transfer of title or by any other means deemed appropriate by the Government."

The Government's complaint in this case charges that the whole of this item of $38,409.16 is fictitious and fraudulent. Whether this charge is sustained by the evidence poses a more difficult problem than that with regard to the claim of the Potomac Enterprises just discussed.

There are a number of circumstances relating to this large item of the whole of the Government's claim which tend to throw much suspicion upon the bona fides of Leyde in including it. In the first place, this large item in the claim was not itemized; and, as heretofore mentioned, in May 1945 Leyde apparently became "termination conscious" in that he inquired at the Maritime Commission's office whether, in the event of cancellation of contracts by the Government, he would be entitled to include in his claim an item of this character, and was advised that it was apparently not allowable. When the Maritime Commission's auditor conferred with Leyde about this item it developed that all of the costs comprising the total amount of the item had been incurred prior to the making of any of the five prime contracts. The auditor expressed much doubt that such a claim would be allowed but Leyde nevertheless insisted upon it and all of it and every particular item of it. At the bottom of the claim as filed there was added the certificate of Leyde & Leyde

in accordance with the printed form that the itemized charges had been prepared from the contractor's books of accounts and records according to recognized accounting practices and were only those which were applicable to the particular contracts. Leyde did not turn over to the auditor for his personal inspection his books of account but read off the items to the auditor who, footing them up, found they corresponded in exact amount with the aggregate of the particular item of claim. At the trial of the case the defendant was unable to produce checks, vouchers or other supporting data for a large portion of the whole amount here involved. It is now apparently admitted that included in the aggregate of the items were numerous particular items in incorrect amounts, some were inadvertently included and some merely estimated and some were not directly allocable as costs incurred by Leyde under the contracts referred to.

The particular charges and cost items aggregating the total of $38,409.16 have been itemized on page 6 of Plaintiff's Ex. 42. Of the total amount, $27,108.06 of costs were incurred in the year 1944 and $11,301.10 in 1945, before the making of the prime contracts. It will be remembered that Leyde & Leyde had no factory, no staff of engineers or other employees and no business office other than at his own dwelling. These conditions, together with the fact that the cost items were incurred before the contracts were made, and the intrinsic nature of the particular items themselves all point very clearly indeed to the conclusion that none of the items were reasonably allowable under the regulations referred to in the claim. Among the particular items included are state and federal taxes on the Leyde home, on two automobiles, two boats and personal property; repairs and supplies and depreciation for two automobiles and maintenance of and supplies and depreciation for two boats, a cruiser and a speed boat; and fees paid an accountant for services in an internal revenue court suit, and salary in the amount of $4425 for Mrs. Leyde, one of the partners, and $12,000 for services of Glenn W. Leyde. Also included were more than $1,000 for rent

on the Leyde home and nearly $3,000 for expense of business entertainment. It also appeared that in preparing the claim Leyde had apportioned 75% of the cost of all his business activities for 1944 and a portion of 1945 to these contracts.

While it seems patently clear that this large item in the Leyde claim was extravagant, unreasonable and not allowable, the ultimate question is whether it was also fictitious or fraudulent. This is the difficult question to determine. There are points in evidence which substantially tend to negative actual fraudulent intent on Leyde's part in advancing this claim even though seemingly so exaggerated and unreasonable to a disinterested person. Thus for instance, I am satisfied from the evidence as a whole that Leyde personally thought he ought to be entitled to reimbursement for these costs in whole or in large part because he felt that he had given much personal time and attention and incurred expenses in the general development of life saving devices for marine equipment including the design of the raft in question which finally after some unsuccessful efforts received the approval of the Coast Guard, and was made the basis for the prime contracts with the Government. As tending to negative actual fraudulent intent it appears, as has been stated, that Leyde well knew from prior inquiry that this item in the claim would encounter serious opposition in the accounting department of the Maritime Commission. Again Leyde conferred with Mr. Hook, a reputable accountant, with regard to the inclusion of this item and received his advice that without knowing about the particular figures there was a reasonable basis for submitting the claim for consideration. Still further we must remember that the general situation with which Leyde was dealing was a very unusual if not unprecedented one resulting from the cancellation of the contracts so comparatively soon after they had been made and subcontracted for by Leyde. Again the wording of the applicable section of the regulation is in rather general language and could possibly be interpreted by an interested person as entitling him to some compensation along that line. It seems further to have been Leyde's understanding that as a practical matter it was necessary, or at least highly advisable, for him in submitting his claim, even though called an interim claim, to include everything possible at the time for fear that failure to do so might operate to disadvantage if the items were only subsequently advanced for consideration. In this respect there is possibly a partial analogy to a claim for damages for breach of contract in the ordinary form of law suit where a plaintiff sues without the benefit of counsel and advances extravagant, exaggerated and unreasonable claims which cannot be judicially summarily rejected without due process of hearing and adjudication.

Probably the most vulnerable item in this particular claim for $38,409.16 is the one (on page 6 of Plaintiff's Ex. 42) reading: "10. Material and services—expenses claimed relative to experiments—$10,396.-46". From the evidence as a whole the amount here claimed seems excessive. And at the trial Leyde was able to produce books, vouchers and supporting papers for only approximately one-half of this whole amount; although as I recall the evidence Leyde claimed that there were book items which purported to support the item in full. In view of the nature and history of the case it is not unnatural to find difficulty on Leyde's part in supplying precise figures and supporting written data by checks or otherwise for every one of these items at this late date. His bookkeeping was rather informal, sometimes by his wife and sometimes by himself. In the course of numerous hearings before the Maritime Commission and in the criminal trial in Washington his books and papers were for long periods of time, and indeed until only shortly before the trial here, out of his own possession and in the possession of various representatives of the Government from time to time. And as I have indicated, there has been resulting confusion generally in the development of the great amount of documentary evidence in this civil case.

■ Weighing the evidence pro and con on this particular issue of fact, I conclude that the Government has not sustained the

charge of fraudulent action or intent by Leyde as to this item of $38,409.16 by the degree of clear, unequivocal and convincing evidence which should be made the basis of a finding of fact as to actual fraud. Mere suspicion of fraud is not sufficient. The degree of proof required is not, as in the criminal case, beyond a reasonable doubt, but it must be clear and satisfactory, and where dependent upon circumstantial evidence alone, all the circumstances should be consistent only with the conclusion of fraud. Some of the circumstances here tend to negative actual fraudulent knowledge and intent on Leyde's part. The patent inadmissibility of the claim, and Leyde's knowledge that it would be challenged are suggestive of his self-interested stubbornness but not necessarily of his deceptive intent. Particularly I do not find in Leyde's actions or conduct with respect to this item of the claim any specific and definite badge of fraud such as a false or fictitious voucher or other particular item of accounting convincingly shown to have been known to Leyde as fraudulent and fictitious. In this connection I do not fail to bear in mind the significance of my previous finding of fraud with respect to a part of the claim of the Potomac Enterprises. Despite this, I am not satisfied that I should find the particular part of the claim now under consideration as definitely fraudulent. Discrimination is necessary between the two items. In the Potomac Enterprises claim the defect was latent, while in the latter it was patent on the face of the items when presented to the auditor.

There are other items, minor in amount, charged in the Government's complaint to be fraudulent and fictitious incidental to the item of $38,409.16. They are $1,230.32 for general and administrative expenses of Leyde & Leyde and $2,876.24 profit on the said alleged costs. As these items are merely incidental to the item of $38,409.16, I think it unnecessary to discuss them further other than to say my conclusion, for the reasons already stated, is that the Government has not shown them to be fraudulent in fact.

The resulting items challenged in the complaint are for the very minor sums of $551.56 for general and administrative expenses and $22.13 profit said to be applicable to Leyde's claim filed October 29, 1945 with respect to prime contract WSA 9909. In view of the length which this opinion has already acquired, I think it unnecessary to more than say that I do not find such distinct and convincing evidence of fraudulent intent with respect to these items as would warrant a finding in favor of the plaintiff.

In summary, my final conclusion on the finding of facts and as a conclusion of law is that the plaintiff has established that the items in the claim of Potomac Enterprises in the amount of $15,155.64, were false, fictitious and fraudulent; but has failed to establish as false, fictitious or fraudulent the remaining items as alleged in the complaint. Nor has the plaintiff proved any actual damages. In consequence the plaintiff is entitled to recover under the Contract Settlement Act the sum of $5,788.91, being 25% of $15,155.64 ($3,788.91) and the further sum of $2,000 for the particular false claim. Counsel may submit the appropriate form of order for judgment in due course.