**ARLINGTON TRUST COMPANY, Incorporated, Assignee of Leyde & Leyde, a Partnership,**

v.

**The UNITED STATES.**

**Glen W. LEYDE**

v.

**The UNITED STATES,**

**Berkeley Steel Construction Company, Third-Party Defendant.**

Nos. 49687, 49688.

United States Court of Claims.
March 6, 1956.

William A. Kehoe, Jr., Washington, D. C., for plaintiffs. Kane & Koons, Washington, D. C., were on the briefs.

Edward L. Metzler, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. Herbert M. Canter, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

These are suits brought pursuant to Section 13(b) of the Contract Settle-

ment Act of 1944, 41 U.S.C.A. § 113(b). The plaintiffs seek to recover money to which they claim they were entitled upon the termination, by the Government, of certain contracts which the Government had entered into with the partnership of Leyde & Leyde, and which, while only partially completed, were terminated. In case No. 49688 Glen W. Leyde sues as the surviving partner of the original contracting firm. His suit relates to one contract. In case No. 49687 Arlington Trust Company, hereinafter called Arlington, sues as assignee of Leyde & Leyde of the partnership's rights under four other contracts. Glen W. Leyde was, during the existence of the partnership, its manager, and, upon the death of the other partner, his wife, in 1948, became the owner of the partnership's assets. The name Leyde, as used hereinafter, will refer to the partnership, or to Glen W. Leyde, as the context indicates.

The four contracts upon which the Arlington suit is based were made by the United States Maritime Commission with Leyde & Leyde on April 19, 1945. They were officially designated as MCc 38104, 38105, 38106 and 38107. These contracts were for the construction of 391 reversible life rafts. The fifth contract, on which Leyde's suit is based, was also with the Maritime Commission, was dated June 16, 1945, and was for 175 life rafts.

On May 1, 1945, Leyde & Leyde assigned to Arlington all of its rights to the money which would become due to it from the Government under the four contracts of April 19, 1945. These assignments were made pursuant to the Assignment of Claims Act of 1940, 54 Stat. 1029, 31 U.S.C.A. § 203. Arlington gave the necessary notices of these assignments to the Maritime Commission and to the General Accounting Office. Leyde & Leyde did not assign the fifth contract to Arlington.

On April 20, 1945, Leyde subcontracted to Gordon and Company of Manteo, North Carolina, the manufacture of 100 of the life rafts covered by the first two of its contracts, with the privilege of enlarging the subcontract to include all of the 256 rafts covered by the first two contracts. On or about May 2, 1945, Leyde subcontracted to Barry Manufacturing Company of New York City the manufacture of 152 of the rafts covered by Leyde's contracts with the Maritime Commission.

The Government's contracts with Leyde reserved to the Government the privilege of termination. The first four contracts were terminated by telegraphic notices on August 20, 21 and 22, 1945. Leyde immediately notified the subcontractors, Gordon and Barry, of the terminations. At the time of termination, Gordon had completed 84 rafts and Barry had completed 40. Leyde's unassigned contract No. WSA–9909 was terminated by the Government on September 5, 1945.

The Office of Contract Settlement, pursuant to the Contract Settlement Act of 1944, 58 Stat. 649, 66 Stat. 627, 41 U.S.C.A. § 101 et seq., issued Regulation No. 8 as authorized by section 4(b) of the Act, prescribing forms to be used by contractors in presenting termination claims. The objective of the Contract Settlement Act is, of course, to enable contractors with the Government who have expended money in connection with their contracts, and who have not been permitted to recover that money by completing their contracts and getting paid for the completed product, to recover the money spent, together with a reasonable profit. In filing a termination claim, a contractor could ask for an immediate partial payment to be made to him without waiting for a complete audit of his claim.

On October 26, 1945, Leyde filed termination claims under the first four contracts totaling $66,862.42, and asking for partial payments amounting to $40,000, and a claim under the fifth contract, No. WSA–9909, asking for $32,906.99, and for a partial payment of $25,000. Leyde included a separate termination claim for Gordon, and in November, a separate claim for Barry.

There was also a separate termination claim for an alleged subcontractor called Potomac Enterprises, Inc. Further mention of Potomac will be made hereinafter.

On November 7, 1945, the Maritime Commission approved a partial payment to Leyde of $19,000 on the termination claim on the fifth contract, and that payment was made to Leyde in December. In January, 1946, the Commission audited Leyde's claims and found Leyde's records to be in poor condition and incomplete. In 1946 Leyde addressed several inquiries to the Commission asking for final settlement of the claims of Leyde and Potomac. In November 29, 1946, the Commission's Settlement Review Board, having been requested to do so by Leyde, made findings on the termination claims under all five contracts, but not on the subcontractors' claims, which, as to the subcontractors other than Potomac, were being settled by the Commission directly with the subcontractors. The Board's ultimate finding was that, as a result of the partial payment of $19,000 made to Leyde and referred to above, Leyde was indebted to the Commission in the amount of $8,296.57.

On December 26, 1946, Leyde filed an appeal from the Settlement Review Board to the Commission. Extensive hearings were held in February and March 1947 by the Commission's Findings Appeal Board. On March 31, 1947, before the Appeal Board had made a recommendation, the Commission wrote Leyde's attorneys that the findings appealed from had been set aside and the Appeal Board would make no recommendation pending a determination by the Department of Justice "upon both the criminal and civil fraud phases of the claims of Leyde & Leyde." The Commission referred to the Regulations which provided for such action.

In July 1947, Glen W. Leyde was indicted for violation of the False Claims Statute, 18 U.S.C. § 80, 1940 ed.,[1] in the presentation, in October 1945 of the termination claims on all five contracts. After a trial he was acquitted on January 30, 1948. In May 1948, the United States instituted civil forfeiture proceedings under section 19 of the Contract Settlement Act of 1944, supra, against Glen W. Leyde, his wife, and the partnership of Leyde & Leyde, in the United States District Court for the District of Maryland. The basis of the suit was the presentation of the termination claims in October 1945. 'The suit by the Government was for damages and penalties. There was a long trial and the District Court in March 1950 rendered a detailed written decision. United States v. Leyde & Leyde, D.C., 89 F.Supp. 256. The court found that items amounting to $15,155.64 in the subcontractor claim of Potomac Enterprises filed by Leyde were fraudulent and judgment was entered for one-fourth of that amount plus $2,000, plus costs, a total of $7,066.61. As to the alleged fraud in the other termination claims, the court held that it had not been proved.

On June 14, 1950, Arlington filed its suit in this court as the assignee of Leyde of the first four contracts, and Leyde filed his suit as the owner of the fifth contract, No. WSA–9909. Arlington sues for $79,073.63 plus interest, and Leyde sues for $18,013.40 plus interest.

On August 4, 1950, the Division of Claims, Maritime Administration of the Department of Commerce, the successor of the Maritime Commission, wrote Leyde enclosing findings on the termination claims, which findings were identical with those made on November 29, 1946, and set aside by the Maritime Commission on March 25, 1947.

In Arlington's suit, the Government made a motion for summary judgment, based on the District Court's adjudication that Leyde had filed a fraudulent claim. We held that Leyde's fraud would not work a forfeiture of the rights

---

**1.** 1948 Revision, 18 U.S.C.A. §§ 287, 1001.

of his assignee. Arlington Trust Co. v. United States, 100 F.Supp. 817, 121 Ct. Cl. 32. The Government made a second motion for summary judgment, on the ground that the petition was not timely filed. That motion was denied, 109 F.Supp. 722, 124 Ct.Cl. 309.

In Leyde's suit, the Government filed a counterclaim for $18,390.81 plus interest, based upon an alleged overpayment by the Maritime Commission on Leyde's termination claim under the fifth contract, WSA–9909.

The Government has not entered a plea of fraud in these cases, but in the trial of the cases, and in its brief and argument it urges that many items of the claims were fraudulent. So far as fraud as a ground for forfeiture of even valid items of the claims, because of the fraudulent nature of other items, is concerned, that issue has been adjudicated. In the District Court suit discussed above, the Government charged Leyde with fraud in regard to all the claims. The court decided as we have recited above. The same issue, between the same parties, in a civil suit, was adjudicated, and will not be re-adjudicated in this case. This is not to say that in determining the merits of the items of the claims we will close our eyes to the fact that Mr. Leyde, who prepared and presented the claims which were adjudicated fraudulent, is the same individual who prepared and presented the claims here sued on, and was the principal witness in support of the claims. It would be a mistake to base conclusions upon his testimony, if the other facts and circumstances point in another direction.

There are a number of items in the claims which still involve supposed transactions between Leyde and Potomac Enterprises. In these transactions Potomac is supposed to have acquired materials from suppliers and resold them to Leyde at increased prices, and the increased prices are stated in the claims as Leyde's cost. Potomac was adjudicated "false, fictitious and fraudulent" by the District Court and we have found it to be nothing more than another name for Leyde. We disregard all these wash transactions and will not discuss them further. The inflations represented by them should have been eliminated from the petitions in these cases.

The parties are in disagreement as to whether certain expenditures which were included in the termination claims under the heading "Indirect factory expense," and are called, in Arlington's suit, "Experimental and research expense," are properly chargeable to the Government, upon the termination of the contracts.

The findings of the Maritime Commission's Settlement Review Board, later set aside and still later re-adopted, as recited above, rejected Leyde's claims for experimental work, research, engineering and development because the expenditures were made

"many months before the prime contracts were entered into, were not incurred in preparing to operate specially under the terminated prime contracts or under these or other war production contracts."

It is true that the claimed expenditures were made before the contracts were entered into, which was on April 19, 1945. Early in 1944 Leyde learned that the Maritime Commission was about to increase its procurement of life rafts complying with Coast Guard specifications. Leyde thereupon devoted the balance of 1944 and the first 3½ months of 1945 to the development of a self-righting, self-bailing raft. He made bids to the Commission in September 1944 and February 1945 which were not accepted. During the period of experimentation Leyde designed five test rafts of various types which were constructed for him by other persons, Leyde having no raft-manufacturing facilities.

The Maritime Commission would buy only rafts the designs of which were approved by the Coast Guard. On October 7, 1944, the Coast Guard gave written approval to Leyde's design for

one type of raft, and on February 20, 1945, to his design for an improved type. On February 19, 1945, the Commission issued an invitation to bid on 691 life rafts, with specifications which would have been met by either of Leyde's designs. The invitation required that bids be accompanied by written evidence of Coast Guard approval.

Leyde arranged for subcontracting the manufacture, if he obtained a contract, and submitted a bid on March 1, 1945. As we have seen, Leyde was awarded four contracts on April 19, 1945, and the fifth one on June 16, 1945.

 We think that Leyde's experimental expenses in 1944 and the early months of 1945 were not properly includible in the termination claim. He was experimenting to develop a raft which the Commission would be willing to buy, if the price was right. He had no contract, nor promise of a contract. If his bid had not been finally accepted, he would not, of course, have had any way of recouping his experimental expenses from the Government. When he incurred the expenses, he was speculating on being able, at some time, to sell his product to someone, probably the Government, for enough to repay his development costs and give him a profit.

The termination regulations, which are quoted in our findings, are not clear, at least to persons not skilled in accounting. We suppose that the officers in the Maritime Commission applied the same rule to Leyde that they applied to all other contractors similarly situated. We have been cited to no decision, administrative or judical, to the effect that expenses incurred before the making of a war contract are reimbursable as termination expenses. It would be remarkable, as the Government urges in its brief, if one received a war contract which included a termination clause, on one day, and the war ended the next day and the contract was terminated, and the contractor had not made a single move or expenditure under the contract, but the Government already owed him a

large sum of money which he had expended in experimentation before he received the contract. One looks in vain for a distinction between his position and that of all the other bidders who did not get the contract, but who had spent as much on experimentation as he spent.

Settlement expenses as proved, but not including those incurred in the appeal proceeding, may be included in the judgments.

 Arlington, in its suit, asks for $9,800 as "interest on borrowings" down to June 1, 1949, and for such additional amount as shall accumulate to the date of final payment. Since Arlington's rights are only derivative rights which it must trace through Leyde, it cannot, of course, recover anything which would not, in the absence of the assignment, be recoverable by Leyde. The interest which Leyde actually paid for money borrowed to finance the contracts during the contract period has already been included under the item "General and Administrative Expense." Arlington will get credit for that. The interest claimed and now under consideration is the interest on four notes which are still unpaid, as follows:

| Date of note or last renewal: | Principal amount |
|---|---|
| January 11, 1946 | $20,000.00 |
| January 22, 1946 | 21,921.92 |
| February 9, 1946 | 10,000.00 |
| November 18, 1949 | 6,567.34 |
| Total outstanding | 58,489.26 |

Arlington would have us treat it as the holder in due course of unpaid notes on which the maker is obliged to pay interest until the notes are paid. But the United States was not the maker of the notes. Its only obligation was to pay to Leyde, or to his assignee, his expenses properly chargeable as expenses related to the performance of the terminated contracts. If Leyde borrowed money from Arlington representing that he would use it for contract pur-

poses, but he in fact used the money for other purposes, he would not, of course, thereby acquire any right to any payment from the Government, and Arlington's right to receive Leyde's payments from the Government would be the right to receive nothing.

The Joint Termination Regulations, section 553, provided that "a war contractor will not be reimbursed for interest on borrowings * * * to the extent that such interest accrues after the effective date of termination." If this were not the rule, the contractor could use his money, after termination, for other purposes, and leave the debts, to secure which he had assigned his contracts with the Government, unpaid, and continue to collect interest from the Government as a contract cost. Section 6 (f) of the Contract Settlement Act provides for the payment of interest at 2½ percent per annum for the period beginning thirty days after termination and continuing until final payment. This statutory interest is the only interest which Arlington is entitled to recover. It will be computed, not on the basis of Leyde's notes to Arlington, but on the basis of the amount which Arlington may recover from the Government.

■ Some matters relating to Leyde's suit, which is based on Contract No. WSA–9909, deserve discussion. This contract was sublet to the L. D. Reeder Company of San Francisco. Reeder sublet its subcontract to Berkeley Steel Construction Company of Berkeley, California. Leyde had promised to procure or assist Reeder in procuring the life raft equipment which had to be enclosed in each raft when it was delivered. Leyde bought from the Commission and paid for a considerable quantity of such equipment. In July 1945, Berkeley agreed to buy from Leyde a part of this equipment which had cost Leyde $1,473 and Leyde shipped it to Berkeley, which refused to accept delivery. When the Government contract was terminated on September 5, 1945, the equipment was on Berkeley's premises. Leyde included it in its ter-

mination claim. The Commission sold some of it for $455, and destroyed the balance. It credited Leyde with the $455. We think Leyde should have been allowed the rest of the $1,473. It was a proper contract activity for it, in view of its discussions with Reeder, to procure this equipment for its subcontractor, and to ship it when it was ordered. Leyde was not paid for it, and its loss of the equipment and the money arose out of the performance of its contract.

■ Leyde had similar raft equipment stored at Morgantown, Maryland, which it had bought from the Commission for $1,861.15. Leyde apparently hoped to sell it to one of its subcontractors at a profit, but it had no agreement to do so, and the subcontracts with Gordon and Barry provided that they should furnish their own equipment. Leyde in its termination claim included this equipment as termination inventory. It was not termination inventory since Leyde merely had it for possible resale. The Government then removed it to Government warehouses in Baltimore. When the Commission discovered that it was not properly termination inventory, and that it had been three times overvalued, it offered to return it to Leyde at his shipping expense. We know nothing further about this equipment. Leyde is not entitled to recover for its value.

Styrofoam, a buoyant material manufactured by the Dow Chemical Company, was a principal element in the manufacture of the life rafts covered by Leyde's contracts. Leyde controlled the procurement of styrofoam because it held War Production Board allocation orders for it. On June 29, 1945, Berkeley ordered 9,800 feet, which would make three carloads, of styrofoam from Leyde to be shipped in carload lots commencing in early July. On July 17 Berkeley wired Leyde to ship one carload August 5, one August 15, and one early in September. Dow shipped one carload July 27, one August 17, and one September 5. On September 5 the Government terminated the contract. On September 11

Berkeley wired Leyde that it would not accept the third carload, but on September 21 it wired that it would accept it if Leyde would pay the freight and all other charges. Leyde wired Berkeley on September 22 that Berkeley should include the freight, storage and handling charges in its termination claim and Leyde would include the styrofoam in its termination claim.

In October 1945, Berkeley requested the Commission's permission to file its termination claim directly with the Commission instead of through Leyde. This permission was granted. Leyde protested because of Berkeley's unpaid indebtedness to Leyde. Berkeley filed its termination claim January 15, 1946. Its claim did not include any of the three carloads of styrofoam mentioned above, and for which it had not paid Leyde. Leyde reminded the Commission that it had already received a partial payment of $19,000, based largely on the cost of this styrofoam. The Commission advised Leyde that it would consider Leyde's and Berkeley's claims together, to insure a just settlement, and that the Berkeley claim did not include the styrofoam. As late as September 1946, Berkeley filed a revised claim with the Commission, and still did not include the styrofoam. About this time the Commission advised Berkeley that it should revise its claim to include the first two carloads of styrofoam, which, the Commission said, belonged to Berkeley. Berkeley then did so, and the Commission then paid Berkeley for it. The Commission then sold the three carloads of styrofoam for $3,500 and credited Leyde with $1,173.55 as the proceeds of the last carload.

Leyde had paid Dow $12,785.19 for the three carloads of styrofoam, and received on its termination claim only the credit of $1,173.55 mentioned above. Berkeley never paid Leyde or anyone else for the two carloads for which the Government paid it.

■ We think the Commission was wrong in, in effect, forcing this pay-

ment on Berkeley, when both Berkeley and Leyde were insisting that it belonged to Leyde, and the Commission knew that Leyde had not been paid by Berkeley for the styrofoam. We are not inclined to examine too closely into the technical location of the title to this property which was, we think in the circumstances, none of the Government's business. We also think that Leyde was entitled to include the cost of the last carload, in his termination claim, although it might possibly have been justified in refusing to pay Dow for it, because Dow shipped it without first checking with Leyde. The freight charges of $273.74 on the third carload, first paid by Berkeley, and reimbursed to Berkeley by Leyde, are also properly includible in Leyde's claim.

As shown in finding 74, Leyde has received $913.35 more than the amount of his allowable costs under the fifth contract, WSA-9909.

The Government has filed a counterclaim in the Leyde case, based on the excess of the $19,000 paid to Leyde on December 12, 1945, as a partial payment on its termination claim on this contract, over the amount actually due on the claim. That excess is $913.35, and the Government is entitled to a judgment for that amount on its counterclaim.

The Government has filed a cross claim against Berkeley asking for a judgment against it for the amount paid Berkeley on its termination claim for styrofoam, if the court should hold, as it does, that Leyde should get credit for the styrofoam. The theory of the cross claim is that the payments to Berkeley were made under a mistake of fact, or law, or both, if the payments should not have been made to Berkeley. The cross claim is based upon section 14 of the Contract Settlement Act of 1944, 41 U.S.C.A. § 114(b).

■ Although Berkeley has not, in its answer, questioned our jurisdiction, we think we do not have jurisdiction.

564

Berkeley is not asserting any claim against the Government, either for the same money sought by Leyde, or for any other money. It has already been paid. If the Government desires to sue Berkeley, it will have to do so in a court which has jurisdiction in such cases. We have concluded that we were wrong in taking jurisdiction over the third party in Central National Bank of Richmond v. United States, 91 F.Supp. 738, 117 Ct.Cl. 389.

The tabulation in finding 54a shows that, as to the four contracts assigned by Leyde to Arlington, and on which Arlington's suit is based, the Government paid $5,124.87 more than the amount of the allowable costs.

██ We now consider the Government's judgment for $7,066.61, with interest, against Leyde, awarded to it in the District Court fraud case. The Government has filed no plea of setoff or counterclaim in these cases for the amount of this judgment. The Government points out that under our Rule 21, 28 U.S.C.A., as it was before May 15, 1951, the defendant could without special plea ask for a reduction or extinguishment of the plaintiff's demand by any matter arising out of the same transaction as that sued upon. We think it was not necessary for the Government to plead a setoff. If anything were found to be due Leyde, the setoff would be applied against the amount otherwise due. There being, however, nothing otherwise due Leyde, the setoff would be applied against Arlington, if anything were found to be due Arlington on its assignments. The Assignment of Claims Act of 1940, 31 U.S.C.A. § 203, makes express provision that certain agencies of the United States may insert in their contracts a provision that payments to an assignee shall not be subject to reductions or setoffs, and if such a provision is inserted, no setoff arising independently of the contract may be made. The statute provides that, in addition to the named agencies of the Government, any other agency of the Government designated by the President may insert such a provision in its contracts. No such provision was inserted in the Leyde contracts, nor does it appear that the Maritime Commission was authorized by the President to insert such a provision in its contracts. The setoff would, therefore, be made against Arlington, if Arlington were otherwise entitled to recover.

Arlington is not entitled to recover. Its petition will be dismissed. Leyde is not entitled to recover. His petition will be dismissed. The United States is entitled to a judgment for $913.35 on its counterclaim against Leyde in case No. 49688. The Government's cross claim against Berkeley is dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.